Filed 12/9/20  P. v. Waite CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>DOC C. WAITE,<br><br>    Defendant and Appellant. | H046785<br>(Santa Cruz County<br>Super. Ct. No. 18CR06376) |

Following a trial, a jury found defendant Doc C. Waite guilty of assault with a deadly weapon (Pen. Code, § 245, subd. (a)(1))[1] (count 1), assault by means of force likely to produce great bodily injury (§ 245, subd. (a)(4)) (count 2), and trespass by entering and occupying property (§ 602, subd. (m) [hereafter 602(m)]) (count 3).  The trial court sentenced defendant to a total prison term of two years.

On appeal, defendant argues that the trial court erred by (1) admitting over objection, photographic evidence of a prior assault victim's injuries; and (2) failing to give the correct instruction for the crime charged in count 3, a violation of section 602.1, subdivision (a) (hereafter 602.1(a)).  Citing *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*), defendant also claims ineffective assistance of counsel based on his counsel's failure to object on due process grounds to the imposition of a court operations assessment (§ 1465.8, subd. (a)(1)), a court facilities assessment (Gov. Code, § 70373,

_____

[1] All further statutory references are to the Penal Code unless otherwise stated.

subd. (a)(1))—sometimes called the criminal conviction assessment—and a restitution fine (§1202.4, subds. (b), (c)) due to his inability to pay.

We find no reversible error. Accordingly, we will affirm the judgment.

I

*Evidence*

*Prosecution's Case-in-Chief*

R.E. testified that he was a deacon in his church, the Watsonville Seventh Day Adventist Church. The church held services on Saturdays. R.E. attended services there every weekend.

At trial, R.E. stated that people were not allowed to sleep or stay on church grounds and that sanitation and safety concerns were the reasons for the unwritten policy. The church had had issues with homeless people making fires, going to the bathroom, leaving trash and needles, and camping out on its property. On average, the deacon had had to ask someone to leave once a week. In connection with those requests, there had never been an assault, prior to the incident with defendant. R.E. usually referred people to the Salvation Army, where his wife and he volunteered once a month.

On Saturdays, R.E., who had keys to the church building, arrived at the church between 8:10 a.m. and 8:20 a.m. to open it up. Church services began at 9:30 a.m. Generally, the deacon did "a quick walk-around" and picked up debris. People sometimes parked there on Friday nights and left their "drinking containers on the ground." He routinely cleaned up the front entrance and the stairwell, removed leaves that had accumulated there, and made sure the heaters were on.

Prior to October 6, 2018, R.E. had become familiar with defendant but did not know his name. Approximately five months before October 6, 2018, in the early evening, R.E. had found defendant camped out in a corner of the church under the eaves. His belongings were alongside his bedding. There were blankets, clothes, and open food containers. On that occasion, the deacon had told defendant that he could not stay there.

2

Defendant had responded that the pastor had given him permission to stay. According to R.E., the pastor never gave permission to stay to people and had in fact asked him to deal with issue of people staying or sleeping on church grounds.

When R.E. discovered defendant at the church the next evening, R.E. again told defendant that could not stay there. After R.E. discovered defendant at the church on the third evening, R.E. warned defendant that he was going to return at 3:00 a.m., and defendant said that he would be gone. When R.E. returned at 3:00 a.m., defendant was still there. Defendant told R.E. that he would be gone by 5:00 a.m. R.E. warned that the police would be involved if defendant was still there at 5:00 a.m. When R.E. returned at 5:00 a.m., defendant was gone.

Subsequently and before October 6, 2018, R.E. once saw defendant in the church's lobby as he came out of the bathroom. R.E. had never seen defendant in the church's worship area.

When R.E. arrived at the church on October 6, 2018, he discovered defendant near the church steps. R.E. recognized defendant from their prior interactions. Defendant had possessions on the ground; some of his belongings were in a Target shopping cart. R.E. saw a lot of clothes and trash. R.E. told defendant that he could not stay there and suggested that he go to the Salvation Army. Defendant indicated that he could not follow its rules, and R.E. responded that the church had rules and he could not stay. At this point, defendant seemed to be getting agitated.

At trial, R.E. testified that he looked away from the defendant and turned his body to point out all the trash. R.E. felt something hit him in the head and a sharp pain; he thought he was going to pass out. R.E. heard a "clunk" and "the sound of metal hitting the cement." When he looked, he saw a pipe. Defendant then charged him "like a football player" and ran him into a wall. Defendant pinned R.E. against a railing, which resulted in some bruising to R.E.'s back. With his right hand, defendant grabbed R.E.'s groin and squeezed, causing pain to R.E.

3

R.E. "grabbed [defendant's] t-shirt and put it partly over his head, whirled him around and ran him into the bushes." R.E. picked up the pipe and said, "[I]t's your turn now." But R.E. did not hit defendant with the pipe. Instead, R.E. told defendant that he was calling the police. Defendant replied, "[G]ood luck, they're not gonna do anything." R.E. went into the church and called 911. The 911 call was played for the jury.

At trial, R.E. testified that defendant was wearing glasses during the incident and that the injuries to defendant's face were from the hedge or bush. R.E. indicated that he never punched or hit defendant in the face. R.E. also stated that during his interaction with defendant, he never fell to the ground or hit his head on the stairs or a railing.

R.E. spoke with Officer Martinez when the officer arrived. In his brief recorded statement to police, which was played for the jury, R.E. described a different chronology. He indicated that defendant first charged him, he then threw defendant in the bushes, and then defendant hit him in the back of his head with a metal pipe. At trial, R.E. agreed that his recorded statement seemed to indicate that defendant had charged him twice, but R.E. recalled being charged only once. During that recorded interview, one of the officers stated that R.E. had a big knot on his head, but R.E. declined an ambulance. At trial, R.E. explained the discrepancies, stating that by the time of recording, his "head was really hurting" and he "got things mixed up."

Efren Martinez, an officer with the City of Watsonville, testified that on October 6, 2018, he received a dispatch and responded to the Seventh Day Adventist Church in less than three minutes. The officer saw a white, adult male exiting a driveway; the man was wearing a backpack and a black jacket and pushing a shopping cart. The male matched the description given by the 911 caller and provided by the dispatcher. The officer detained defendant and placed defendant in his patrol vehicle.

As Officer Martinez was parking in the church's parking lot, R.E., who was holding a metal pipe, approached the officer. R.E. handed the pipe to Officer Martinez

4

and told the officer that he had been struck with it. The officer saw that R.E. had a head injury, which was consistent with being struck with the metal pipe.

At trial, it was Officer Martinez's recollection that he almost immediately turned on his audio recorder. R.E. had mentioned his head pain. Officer Martinez had photographed R.E.'s head injury, which he said was located toward the top of R.E.'s head. Based on the injury's location and his training and experience, Officer Martinez concluded that the head injury was inconsistent with a fall.

*Defense Case*

Defendant testified in his own behalf. Defendant indicated that R.E. was the aggressor and that he "was standing by the cart putting [his] things away when [R.E.] approached screaming and hollering and threatening [him.]" According to defendant, R.E. said, "Your kind ain't supposed to be here." Defendant claimed that R.E. "jumped up on" him and stomped on his feet and broke one of his toes. Defendant testified that R.E. began swinging with his fists and knocked out one of defendant's teeth. Defendant claimed that R.E. landed three or four blows and that he blocked several other blows. According to defendant, a scratch on his face was the result of R.E. hitting him with his fist. Defendant professed that he had felt threatened and a need to defend himself. According to defendant, R.E. grabbed his shirt, pulled it over his head, and repeatedly hit him with something. Defendant acknowledged that R.E. had thrown him into the bushes and that he had pushed R.E. into the wall. Defendant claimed that R.E. had stumbled and tripped on the steps and hit his head on a railing. Defendant admitted that the metal pipe belonged to him but claimed not to have used it against R.E.

On cross-examination, defendant claimed that he had "had [his] stuff out of the cart in a nice orderly fashion basically, and [he] was sitting down on the blankets. He conceded that he had told police that he had "bedded down" at the church but had been up before he—i.e., R.E.—was there. At trial, defendant claimed that "bedding down" did not mean sleeping or camping.

5

On cross-examination, defendant acknowledged that six months before the incident for which he was now being prosecuted, in an earlier Monterey County case, he had pleaded guilty or no contest to another violation of section 245. But he claimed to have acted in self-defense. Defendant said that he was attacked by two people with a baseball bat at a grave site at a cemetery where he took care of graves. Defendant acknowledged that a separate assault took place later at the wharf in Monterey County, but he said that "the original attack was at the cemetery." He explained that the man involved in the later assault at the wharf had "sent two people after [him] with a baseball bat." Defendant testified that after the incident at the wharf, he left the area.

At trial, defendant was shown photographs of the other man involved in the wharf incident. Defendant admitted that the man's facial bleeding reflected in the first photograph was the result of defendant slapping his face three times. Defendant claimed that the man already had the leg injury shown in the second photograph, even though the photograph showed a bloody knee and blood dripping down a leg. According to defendant, the other man had "start[ed] screaming and hollering at [defendant] and [had] jumped up and told [defendant] to stay away from a certain young lady, and [the man] [had] grabbed his crutch and swung [it] at [defendant]." Defendant explained that he had slapped the man in the face and then he had taken the man's crutch "away from him and pinned him to the ground."

The two photographs (exhibits 18 & 19) were admitted into evidence. Before admitting them, the trial court noted the defense's prior objections and overruled them. Also admitted into evidence were documents showing that on May 1, 2018, defendant had pleaded no contest to a misdemeanor assault by means of force likely to produce great bodily injury (§ 245, subd. (a)(4)).

*Prosecution's Rebuttal*

The person who had been the pastor of the Watsonville Seventh Day Adventist Church from August 2007 until September 2018 testified that the church had a consistent

6

policy disallowing camping or loitering on its property.  While he was pastor, he had spoken with the church's deacons about "universally applying the policy" because it was an ongoing issue.

The pastor had previously seen defendant camping or loitering on the church grounds.  He was familiar with defendant, and he had seen defendant on the property when he was not attending services three or more times.  On more than one occasion, the pastor had observed defendant in the back entrance's alcove area, which provided an "attractive spot for a person looking for someplace to sleep out of the rain or weather."  Defendant had a lot of personal items with him, including blankets and food containers.  On more than one occasion, the pastor had informed defendant that he could not camp on church property.  However, once when it was raining, the pastor had given him permission to stay until the rain stopped, which was supposed to happen in a couple of hours.  Generally, when individuals were "hanging out" on the church property with their belongings "during times other than services," they were informed that the church could not "accommodate them on [its] property."  The pastor stated that people who were transient or homeless were welcome to attend church services, and the pastor recalled seeing defendant at services a couple of times.

R.E. was recalled as a rebuttal witness.  R.E. testified that he had never said to defendant, " 'We don't want your kind here?' "  He had never stomped on defendant's feet.  R.E. stated that he had never hit his head on the railing or the steps.

The prosecution called Police Officer Bradley Holden as a rebuttal witness.  Officer Holden testified that at approximately 8:00 a.m. on April 21, 2018, he had interacted with defendant at San Carlos Cemetery in Monterey.  At that point, defendant had no injuries indicating that he had been in a fight.  Later that day, the officer responded to the report of a fight at Fisherman's Wharf.  At 3:41 p.m., Officer Holden contacted the victim, a panhandler whom the officer knew from prior interactions.  The officer testified that upon arriving at the scene, he observed that the victim had "swelling

7

to the nose and cheek area" and "a severe laceration across his nose," which "appeared to be fresh," was "actively bleeding," and "required medical attention." The victim had also sustained a severe "laceration to his right leg just below the knee," which was "fresh," "actively bleeding," and "required medical attention." Officer Holden had taken photographs of the victim, two of which had been admitted into evidence. The officer testified that the victim was transported to the hospital.

II

*Discussion*

A. *Admission of Photographic Evidence for Impeachment*

1. *Background*

In a motion in limine, the prosecution sought a ruling that defendant's prior misdemeanor conviction of a violation of section 245, subdivision (a)(4), and the conduct underlying the conviction, would be admissible to impeach defendant if he testified. In the event that defendant elected to testify, the prosecution intended to prove his prior misdemeanor conduct through the testimony of Officer Holden and a certified copy of his prior conviction from Monterey County.

The defense also brought a motion in limine to exclude evidence of his prior conviction. The defense first argued that misdemeanor convictions were not admissible for purposes of impeachment. The defense also asserted that the evidence of defendant's prior offense was more prejudicial than probative and should be excluded under Evidence Code section 352. Lastly, the defense argued that even if the trial court determined that evidence of defendant's prior conviction was admissible to impeach him, the trial court should exclude photographs of the injuries sustained by the victim of that crime on the ground that they were irrelevant to defendant's credibility.

At the hearing on the motions in limine, the trial court expressed its understanding that the victim of defendant's prior misdemeanor conduct was not available. Following argument, the trial court indicated that it had conducted an Evidence Code section 352

8

analysis, and it ruled that evidence of the prior misdemeanor conviction was relevant and admissible to impeach defendant at trial. As to the photographs of the injuries sustained by the victim of the prior offense, the trial court performed a separate Evidence Code section 352 analysis and found that the photographs were not "graphic" and did not "shock the conscience by any means." The court found that the photographs were more probative than prejudicial, although not "significantly," and that their admission would not be time consuming or confusing to the jury. While the trial court questioned whether it would be necessary to admit three photographs, the court determined that "in all likelihood a photograph [would] be allowed in" if defendant testified.

At trial, out of the presence of the jury, the trial court confirmed on the record that the defendant had objected to the three photographs under Evidence Code section 352, and trial court had overruled the objection as to two photographs and excluded the third as duplicative.

2 *Admission of Photographs of Assault Victim Not an Abuse of Discretion*

a. *Relevancy*

On appeal, defendant argues the evidence of the prior assault victim's injuries should not have been admitted because those injuries were irrelevant to his credibility at trial. Defendant further asserts that even if those injuries were theoretically relevant to his credibility, "[i]t was an abuse of discretion to admit any evidence regarding [the prior victim's] injuries because the prosecutor did not establish that the injuries depicted in Exhibits 18 and 19 were inflicted by [him]."

When defendant was shown those photographs at trial, he admitted attacking the victim at the wharf, and he admitted causing the victim's facial injuries depicted in one photograph. He also admitted that he had pleaded no contest or guilty to misdemeanor assault by means of force likely to produce great bodily injury. The trial court did not abuse its discretion in finding that the photographic evidence of the injuries sustained by the victim of defendant's misdemeanor misconduct was relevant and admissible for

9

purposes of impeachment.  (See Evid. Code, §§ 210, 351; *People v. Wheeler* (1992) 4 Cal.4th 284, 295-296 (*Wheeler*); see also *People v. Castro* (1985) 38 Cal.3d 301, 314-315 (plur. opn. of Kaus, J.) (*Castro*).)

*Castro* determined that "a witness' moral depravity of any kind has some 'tendency in reason' (Evid. Code, § 210) to shake one's confidence in his honesty."[2] (*Castro*, *supra*, 38 Cal.3d at p. 315.)  "[M]oral turpitude" is a general readiness to do evil, even if dishonesty is not involved.  (See *id*. at pp. 314-315.)

In *Wheeler*, the California Supreme Court made clear that "[m]isconduct involving moral turpitude may suggest a willingness to lie [citations], and this inference is not limited to conduct which resulted in a felony conviction." (*Wheeler*, *supra*, 4 Cal.4th at pp. 295-296.)  The court stated that "if past criminal conduct amounting to a misdemeanor has some logical bearing upon the veracity of a witness in a criminal proceeding, that conduct is admissible, subject to trial court discretion, as 'relevant' evidence under [California Constitution, article I,] [former] section 28[, subd.] (d)."[3]  (*Id*.

---

[2] California Constitution, article I, section 28, subdivision (f)(4), states: "Use of Prior Convictions.  Any prior felony conviction of any person in any criminal proceeding, whether adult or juvenile, shall subsequently be used without limitation for purposes of impeachment or enhancement of sentence in any criminal proceeding.  When a prior felony conviction is an element of any felony offense, it shall be proven to the trier of fact in open court."  In *Castro*, a plurality of the court held that "subject to the trial court's discretion [to exclude evidence] under [Evidence Code] section 352," California Constitution, article I, former subdivision (f) (now (f)(4)) "authorizes the use of any felony conviction which necessarily involves moral turpitude, even if the immoral trait is one other than dishonesty."  (*Castro*, *supra*, 38 Cal.3d at p. 306.)  *Castro* indicated that "a witness' prior [felony] conviction should only be admissible for impeachment if the least adjudicated elements of the conviction necessarily involve moral turpitude."  (*Id*. at p. 317.)

[3] California Constitution, article I, section 28, subdivision (f)(2) (former (d)), provides in pertinent part:  "Right to Truth-in-Evidence.  Except as provided by statute hereafter enacted by a two-thirds vote of the membership in each house of the Legislature, relevant evidence shall not be excluded in any criminal proceeding . . . . Nothing in this section shall affect any existing statutory rule of evidence relating to privilege or hearsay, or Evidence Code Sections 352, 782 or 1103."  In *Castro*, the

at p. 295.) It recognized that "in proper cases, nonfelony conduct involving moral turpitude should be admissible to impeach a criminal witness." (*Ibid*.)

In criminal proceedings, the "Right to Truth-in-Evidence" provision of the California Constitution—California Constitution, article I, section 28, subdivision (f)(2) (former (d))—"abrogates Evidence Code section 787's prohibition on admission of specific instances of misconduct that are 'relevant only as tending to prove a trait of [a witness's] character.' (Evid. Code, § 787.)" (*People v. Dalton* (2019) 7 Cal.5th 166, 214 (*Dalton*).) "Evidence of circumstances underlying a conviction is admissible to impeach credibility if the proponent demonstrates that the evidence has 'any tendency in reason' to disprove credibility. (Evid. Code, § 210; see *ibid*. [defining relevant evidence as 'having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action' including 'evidence relevant to the credibility of a witness']; Evid. Code, § 780 ['the court or jury may consider in determining the credibility of a witness any matter that has any tendency in reason to prove or disprove the truthfulness of his [or her] testimony at the hearing . . .'].)" (*Ibid*.)

An assault by means of force likely to produce great bodily injury is a crime of moral turpitude. (See *People v. Elwell* (1988) 206 Cal.App.3d 171, 177; cf. *People v. Hinton* (2006) 37 Cal.4th 839 [a conviction of assault with a firearm denotes moral turpitude and is therefore admissible for impeachment]; *People v. Armendariz* (1985) 174 Cal.App.3d 674, 681-682 [a conviction of assault with a deadly weapon involves moral turpitude within the meaning of *Castro*].) "A witness may be impeached with any prior conduct involving moral turpitude whether or not it resulted in a felony conviction, subject to the trial court's exercise of discretion under Evidence Code section 352." (*People v. Clark* (2011) 52 Cal.4th 856, 931, fn. omitted.) The extent of the injuries

Supreme Court held that the "Right to Truth-in-Evidence" provision "as well as due process, forbids the use of convictions of felonies which do not necessarily involve moral turpitude." (*Castro*, *supra*, 38 Cal.3d at p. 306; see *id*. at p. 314.)

suffered by a victim of aggravated assault may be relevant—i.e., have some "tendency in reason" (Evid. Code, § 210)—to circumstantially show the extent of force exerted in such assaultive conduct and, hence, the degree of moral turpitude associated with the conduct.

On appeal, defendant does *not* suggest that a misdemeanor conviction of assault by means of force likely to produce great bodily is *not* a crime of moral turpitude; that his prior assaultive misconduct underlying that conviction did not involve moral turpitude; that the evidence of that underlying misconduct was irrelevant; or that documentary evidence of his misdemeanor conviction constituted inadmissible hearsay (see Evid. Code, § 1200).[4]  Rather, defendant argues that evidence of his prior misdemeanor misconduct "did not strongly demonstrate moral turpitude" and was only marginally relevant.  This argument goes to the issue whether the probative value of the photographic evidence was outweighed by undue prejudice under Evidence Code section 352, rather than the question of relevance.

Under the Evidence Code, "[n]o evidence is admissible except relevant evidence" (Evid. Code, § 350), but "[e]xcept as otherwise provided by statute, all relevant evidence is admissible."  (Evid. Code, § 351.)  "The trial court has broad discretion in determining

---

[4] In the 1992 *Wheeler* decision, the Supreme Court also concluded that "the *fact of conviction of a misdemeanor* remains inadmissible under traditional *hearsay* rules when offered to prove that the witness committed misconduct bearing on his or her truthfulness." (*Wheeler*, *supra*, 4 Cal.4th 284, 288.)  It held that "evidence of a misdemeanor *conviction*, whether documentary or testimonial, is inadmissible hearsay when offered to impeach a witness's credibility." (*Id.* at p. 300, fn. omitted.)  Evidence Code section 452.5 was enacted subsequent to *Wheeler* (see Stats.1996, ch. 642, § 3), and it has been understood by some appellate courts as establishing a statutory hearsay exception for certified official records of conviction.  (See *People v. Duran* (2002) 97 Cal.App.4th 1448, 1460-1461; see also *People v. Thompkins* (2020) 50 Cal.App.5th 365, 412; *People v. Lopez* (2005) 129 Cal.App.4th 1508, 1522, fn. 8.)  In a 2006 opinion, the California Supreme Court said, "Misdemeanor convictions themselves are not admissible for impeachment, although evidence of the underlying *conduct* may be admissible subject to the court's exercise of discretion.  (*Wheeler, supra,* 4 Cal.4th at pp. 297-300.)" (*People v. Chatman* (2006) 38 Cal.4th 344, 373.)  However, *Chatman* did not consider Evidence Code section 452.5.

12

the relevance of evidence [citations] but lacks discretion to admit irrelevant evidence. [Citations.]" (*People v. Carter* (2005) 36 Cal.4th 1114, 1166-1167.) "A trial court has 'considerable discretion' in determining the relevance of evidence. [Citation.]" (*People v. Merriman* (2014) 60 Cal.4th 1, 74 (*Merriman*).)

As defendant asserts, actual injury is not an element of the offense of assault by means of force likely to produce great bodily injury. (See § 245, subd. (a)(4); see also *People v. Rodriguez* (1998) 17 Cal.4th 253, 261 [former § 245]; *People v. Richardson* (1972) 23 Cal.App.3d 403, 410-411[former § 245]; CALCRIM No. 875 ["No one needs to actually have been injured by defendant's act."].) Nevertheless, the trial court acted within its sound discretion in determining the photographs were relevant for impeachment. It could have reasonably concluded that the photographs would assist the jury in evaluating the degree of moral turpitude associated with defendant's prior assaultive conduct.

b. *Exercise of Discretion under Evidence Code section 352*

Defendant argues that even if the evidence of the prior victim's injuries was relevant, the trial court abused its discretion in admitting the evidence because it was more prejudicial than probative and should have been excluded under Evidence Code section 352. He asserts that the misdemeanor misconduct provides little assistance to a jury in assessing credibility and there was a "high" risk that "the jury would use evidence of the injuries to conclude [that defendant had] a violent character." Defendant also claims that the evidence of the prior victim's injuries was "inflammatory and evoked an emotional bias against [him]." He contends that "it is reasonably probable that absent the evidence, he could have been acquitted."

"Trial courts retain discretion to exclude . . . evidence [of circumstances underlying a conviction that is relevant to impeach credibility] under Evidence Code section 352 'if its probative value is substantially outweighed by the probability that its admission will . . . necessitate undue consumption of time or . . . create substantial danger

13

of undue prejudice, of confusing the issues, or of misleading the jury." (*Dalton*, *supra*, 7 Cal.5th at p. 214.) However, "the test for prejudice under Evidence Code section 352 is not whether the evidence in question undermines the defense or helps demonstrate guilt, but [it] is whether the evidence inflames the jurors' emotions, motivating them to use the information, not to evaluate logically the point upon which it is relevant, but to reward or punish the defense because of the jurors' emotional reaction. [Citation.]" (*People v. Valdez* (2012) 55 Cal.4th 82, 145.) In this context, " 'prejudice' does not mean damage to a party's case that flows from relevant, probative evidence." (*People v. Cortez* (2016) 63 Cal.4th 101, 128.) Rather, the term "refers to evidence that poses an intolerable risk to the fairness of the proceedings or reliability of the outcome. [Citation.]" (*People v. Booker* (2011) 51 Cal.4th 141, 188.)

" 'During the guilt phase, there is a legitimate concern that crime scene photographs . . . can produce a visceral response that unfairly tempts jurors to find the defendant guilty of the charged crimes." (*People v. Box* (2000) 23 Cal.4th 1153, 1201, disapproved on another ground by *People v. Martinez* (2010) 47 Cal.4th 911, 948, fn. 10.) However, "[t]he trial court has broad discretion over the admission of photographs that are alleged to include disturbing details. [Citations.]" (*People v. Caro* (2019) 7 Cal.5th 463, 502 [autopsy photos were not unduly prejudicial].) We have reviewed the photographs of the prior assault victim. They were quite unremarkable, not shocking or grisly.

As suggested by defendant, "[i]n general, a misdemeanor--or any other conduct not amounting to a felony--is a less forceful indicator of immoral character or dishonesty than is a felony." (*Wheeler*, *supra*, 4 Cal.4th at p. 296; see *People v. Lightsey* (2012) 54 Cal.4th 668, 714 ["evidence of [a witness's] misdemeanor conduct—striking her ex-husband with a rock during a dispute—[did] not strongly demonstrate moral turpitude, i.e., a ' "general readiness to do evil" ' [citation]"].) Nevertheless, "[a]n appellate court reviews a [trial] court's rulings regarding relevancy and admissibility under Evidence

14

Code section 352 for abuse of discretion. [Citation.] We will not reverse a court's ruling on such matters unless it is shown ' "the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." [Citation.]' [Citation.]" (*Merriman*, *supra*, 60 Cal.4th at p. 74).) Defendant has not demonstrated that the trial court manifestly abused its discretion in admitting the photographs over an Evidence Code section 352 objection.

Moreover, even assuming for the sake of argument that the trial court abused its discretion in admitting the photographs of the prior victim's injuries, reversal is not warranted. (See Cal. Const., art. VI, § 13 ["No judgment shall be set aside . . . on the ground . . . of the improper admission . . . of evidence . . . unless . . . the error complained of has resulted in a miscarriage of justice."].) First, since jury was aware that defendant was convicted of that prior assault, there is no reasonable basis to fear that the jury might have convicted him in this case for past, unpunished misconduct. Second, as we have indicated, the photographs were not gruesome or particularly disturbing. We have no concern that the photographs would evoke an overly emotional or irrational response from the jurors in deciding defendant's guilt. Third, the jury was told by the court and defense counsel that the photographs could be used only to evaluate defendant's credibility.[5] "We presume the jury followed the trial court's instruction absent evidence to the contrary. [Citation.]" (*People v. Fayed* (2020) 9 Cal.5th 147, 192.)

_____

[5] The trial court expressly instructed the jurors as follows: "If you find that a witness has committed a crime or other misconduct, you may consider that fact only in evaluating the credibility of the witness's testimony. The fact that a witness may have committed a crime or other misconduct does not necessarily destroy or impair a witness's credibility. It is up to you to decide the weight of that fact and whether that fact makes the witness less believable." With respect to the prior assault, defense counsel told the jury: "[Y]ou can consider this evidence to determine [defendant's] credibility, his honesty or lack thereof. But what you can't do is you can't use this evidence for propensity, for character. What I mean by that is you can't look at this evidence and say, well, he did it back then, he did it again. The law is very clear about that. This is for a limited purpose. It's only to weigh a person's credibility, not his character." If defense

15

It is not reasonably probable that defendant would have been acquitted of assault with a deadly weapon had the photographs of the prior assault victim been excluded. (See *People v. Watson* (1956) 46 Cal.2d 818, 836 ["[A] 'miscarriage of justice' should be declared only when [it] is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error."], 837 ["[M]ere possibilities" are not sufficient.].)

B. *Alleged Instructional Error as to Count 3*

Defendant argues that the trial court erred by giving the incorrect instruction with respect to count 3 of the information. He asserts that his failure to object does not forfeit a claim of instructional error consisting of a failure to instruct on all elements of an offense and that trial court's erroneous instruction was not harmless beyond a reasonable doubt under *Chapman v. California* (1967) 386 U.S. 18.[6] (See *People v. Rivera* (2019) 7

_____

counsel had been truly concerned that the photographs might cause the jurors to think that defendant was bad person or had a propensity for violence, she could have asked for a further limiting instruction. (See Evid. Code, § 355; cf. CALCRIM No. 375.)

[6] As part of his claim of instructional error, defendant also contends that the trial court erred by denying the defense's section 1118.1 motion (judgment of acquittal for insufficient evidence), which was made on the ground that defendant was never in continuous possession of church property. He now argues that the court should have granted that motion because the church was not a "business" within the meaning of section 602.1(a), citing Revenue and Taxation Code section 6013's definition of "business." In his reply brief, defendant again makes the conclusory assertion that the church was not a "business" under that tax definition. He further argues in his reply brief that the count 3 conviction must be reversed because no evidence was presented to show that the church was a "business," an element of a violation of section 602.1(a), the original charge. Since defendant does not support his claim that the court erroneously denied the section 1118.1 motion with any legal analysis, we deem this contention forfeited. (See *People v. Stanley* (1995) 10 Cal.4th 764, 793; Cal. Rules of Court, rule 8.204(a)(1)(B).) Further, any attempt to raise a separate sufficiency of the evidence claim for the first time in the reply brief was forfeited. (See *People v. Tully* (2012) 54 Cal.4th 952, 1075 ["It is axiomatic that arguments made for the first time in a reply brief will not be entertained because of the unfairness to the other party."]; *Varjabedian v. City of Madera* (1977) 20 Cal.3d 285, 295, fn. 11 ["Obvious reasons of fairness militate against consideration of an issue raised initially in the reply brief of an appellant. [Citations.]"].) In any case, we conclude that defendant consented to submitting to the jury a charge of

Cal.5th 306, 332-333; *Neder v. United States* (1999) 527 U.S. 1, 17.) He maintains that consequently the conviction must be reversed.

The Attorney General initially agreed that the court gave an erroneous instruction on count 3 because it instructed on the wrong crime and failed to instruct on elements of the charged offense. But the Attorney General maintained that the error was harmless beyond a reasonable doubt.

We asked the parties to submit supplemental briefing on whether by failing to object, defendant implicitly (1) consented to have the jury decide whether he was guilty of a charge of criminal trespass in violation of section 602(m), rather than a violation of section 602.1(a), as originally charged, and (2) waived any objection based on lack of notice. These violations are separate crimes, and their substantive elements are different.

Under section 602.1(a), "[a]ny person who intentionally interferes with *any lawful business or occupation* carried on by the owner or agent of a *business establishment open to the public*, by obstructing or intimidating those attempting to carry on business, or their customers, and who refuses to leave the premises of the business establishment after being requested to leave by the owner or the owner's agent, or by a peace officer acting at the request of the owner or owner's agent, is guilty of a misdemeanor . . . ." (Italics added.) Under section 602(m), a person commits misdemeanor trespass by "[e]ntering and occupying real property or structures of any kind without the consent of the owner, the owner's agent, or the person in lawful possession."

1. *Procedural Background*

As indicated, count 3 of the information originally charged defendant with violating section 602.1(a) on or about October 6, 2018.

During a discussion regarding jury instructions out of the presence of the jury, the trial court told counsel, "Regarding the trespass instruction, that's a little bit tricky,

trespass (§ 602(m)), rather than a charge of interference with a lawful business or occupation (§ 602.1(a)).

17

because the trespass instructions don't necessarily merge with the specific count being alleged here. But I believe that 2931 is most accurate. So that's my intent at this point." Later in the discussion, the court invited the parties to provide input with respect to instructing on count 3. The court again stated: "But I think 2931 is most appropriate. So, as to Count Three, this is what's alleged and these are the elements that need to be shown pursuant to 2931." The court specifically asked defense counsel whether she wished to be heard. Defense counsel replied, "Not at this time." Neither party objected at that time to the court using CALJIC No. 2931 with respect to count 3. CALCRIM No. 2931 is the standard instruction to be used for a charged violation of section 602(m).[7]

Later, the court stated for the record that both the prosecutor and defense counsel had each proposed an instruction pursuant to CALCRIM No. 2931: "Then moving to 2931. There were two instructions provided on 2931, and the difference between the two is that the Defense included a sentence at the bottom of 2931, 'To occupy land or building means nontransient, continuous type of possession.' " The court stated that defense counsel had argued for the inclusion of that additional language, but the trial court had declined to include it. The court did not indicate that either party had objected to an instruction pursuant to CALCRIM No. 2931 on count 3.

Without objection, the trial court did instruct the jury on count 3 pursuant to CALCRIM No. 2931: "The defendant is charged in Count Three with *trespassing*, in

---

[7] CALCRIM No. 2931 provides: "The defendant is charged [in Count _____] with trespassing [in violation of Penal Code section 602(m)]. [¶] To prove that the defendant is guilty of this crime, the People must prove that: [¶] 1. The defendant willfully entered (land/ [or] a building) belonging to someone else without the consent of the (owner[,]/ [or] owner's agent[,]/ [or] person in lawful possession of the property); [¶] 2. After the defendant entered, (he/she) occupied the (land/ [or] building) without the consent of the (owner[,]/ [or] owner's agent[,]/ [or] person in lawful possession of the property); [¶] 3. The defendant occupied some part of the (land/ [or] building) continuously until removed. [¶] Someone commits an act *willfully* when he or she does it willingly or on purpose. [¶] [An agent is a person who is authorized to act for someone else in dealings with third parties.]"

18

violation of Penal Code section 602(m). To prove the defendant guilty of this crime, the People must prove that; number one, the defendant willfully entered land belonging to someone else without the consent of the owner or the owner's agent or the person in lawful possession of the property; two, after the defendant entered, he *occupied* the land without the consent of the owner or the owner's agent or person in lawful possession of the property; three, the defendant *occupied* some part of the land continuously until removed; and four, you should keep in mind someone commits an act willfully when he or she does it willingly or on purpose. [¶] An agent is a person who is authorized to act for someone else in dealings with third parties." (Italics added.)

In closing argument, both parties understood count 3 to be a charge of trespass. The prosecutor referred to the count 3 charge as "criminal trespass." The prosecutor stated, "[T]o prove this count, . . . we must show that [defendant] willfully entered a land belonging to somebody else, that, after he entered it, he occupied it for some period of time without consent of the owner or the owner's agent, and that the defendant occupied some part of the land continuously until removed." The prosecutor asserted that defendant was guilty of criminal trespass because he "took his shopping cart, took out all of his belongings, [and] . . . stay[ed] in that location after being told . . . multiple times not to loiter there, not to camp, [and] to stop that behavior . . . ." Defense counsel did not object to this argument.

In closing argument, defense counsel told the jury that "in Count Three, Mr. Waite is charged with trespass." Counsel argued, "And in order to be guilty of trespass, the Government must prove that Mr. Waite occupied the church. The term occupy has a very specific legal definition. It doesn't mean just being there. . . . [¶] . . . In the legal sense, occupy means nontransient, not fleeting, continuous type of possession. Mr. Waite occasionally sleeping outside of the church three, four, five times over the course of the year is not continuous possession. If he were there for days on end, for weeks on end,

19

then he'd be occupying the church and he'd be guilty of trespass. But that's not what he did here."[8]

Defendant has not identified by specific citation to the record any objection to the jury's verdict option on count 3 or the verdict form itself. The jury's verdict, which was filed December 21, 2018, stated that the jury had found defendant guilty of committing criminal trespass as charged in count 3. The verdict form's caption read, "VERDICT FORM OF THE JURY," "CRIMINAL TRESSPASS [*sic*]," and "PC 602 (M)." The December 21, 2018 minute order confusingly indicated that the jury found defendant guilty of "PC602.1(A)-M-TRESSPASS [*sic*] PUBLIC BUSINESS."

At the time of sentencing on March 27, 2019, the trial court imposed a sentence of 60 days on count 3 and ordered the sentence to run concurrently to the sentence imposed on count 1. Defense counsel did not orally object to defendant's conviction under section 602(m). The March 27, 2019 minute order again confusingly indicated that that defendant was convicted of "PC602.1(A)-M-TRESSPASS [*sic*] PUBLIC BUSINESS."

---

[8] The defense argument tracked *People v. Wilkinson* (1967) 248 Cal.App.2d Supp. 906 (*Wilkinson*), which concluded that the word "occupy" within the meaning of former section 602, subdivision (*l*) (now subdivision (m)) meant "a non-transient, continuous type of possession." (*Wilkinson*, *supra*, 248 Cal.App.2d Supp. at p. 910, see *In re Catalano* (1981) 29 Cal.3d 1, 10, fn. 8 [citing with approval *Wilkinson*'s definition of "occupy" in dictum].) In *Wilkinson*, a superior court's appellate department reasoned: "[T]he transient overnight use of four 3 x 7 foot areas in a very large ranch for sleeping bags and campfire purposes was not the type of conduct which the Legislature intended to prevent when it used the word 'occupy.' Had this been so, many another verb could have been used in place of 'occupy' to express an intention of preventing such transient use of so small an area, e.g., be, remain, loiter, tarry, camp, stay, and probably many more." (*Ibid*.; cf. *In re Y.R.* (2014) 226 Cal.App.4th 1114, 1120-1121 [insufficient evidence of misdemeanor trespass (§ 602(m)) because minor's stay in condominium clubhouse bathroom for up to several hours did not constitute "occupying" the bathroom].) In response to a written jury question about the legal definition of "occupied" in CALCRIM No. 2931, the trial court stated: "To occupy land means [a] non-transient, continuous type of possession." On appeal, defendant makes no claim that the evidence was insufficient to support a conviction under section 602(m).

2. *Analysis*

On appeal, defendant has not suggested that the instruction on criminal trespass in violation of section 602(m) misstated the law applicable to that offense.

"[I]t has been uniformly held that where an information is amended at trial to charge an additional offense, and the defendant neither objects nor moves for a continuance, an objection based on lack of notice may not be raised on appeal. [Citations.]  There is no difference in principle between adding a new offense at trial by amending the information and adding the same charge by verdict forms and jury instructions." (*People v. Toro* (1989) 47 Cal.3d 966, 976, fn. omitted (*Toro*), disapproved of on another point in *People v. Guiuan* (1998) 18 Cal.4th 558, 568, fn. 3.) "[A] failure to promptly object will be regarded as a consent to the new charge and a waiver of any objection based on lack of notice." (*Id*. at p. 976; see *People v. Goolsby* (2015) 62 Cal.4th 360, 367.)

In *Toro*, the California Supreme Court recognized that " 'implied amendment' is a fiction." (*Toro*, *supra*, 47 Cal.3d at p. 973, fn. 4.)  But it stated that " '[w]hen the defendant acquiesces in conviction of an uncharged offense . . . no amendment [of the indictment or information] is necessary.' [Citation.]" (*Ibid*.)  In reaching its conclusion, the court observed: "Although informed of the proposed jury instructions on the lesser related offense of battery with serious bodily injury, and asked to state any objection, the defense did not object to the proposed instructions, or to the verdict forms, or in any other way claim unfair surprise or indicate dissatisfaction with the verdict options provided to the jury." (*Id*. at pp. 977-978.)  The court concluded that the defendant's "failure to object constituted an implied consent to the jury's consideration of the lesser related offense and a waiver of any objection based on lack of notice." (*Id*. at p. 978, fn. omitted.)

Very recently, the California Supreme Court declined to apply *Toro*'s reasoning where enhancements not actually alleged by the operative information were nevertheless

found true by a jury upon instruction, which added a total of 125 years to life to the defendant's sentence.  (*People v. Anderson* (2020) 9 Cal.5th 946, 949-950 (*Anderson*).)  The Supreme Court reversed and remanded for resentencing "[b]ecause [the defendant] did not receive adequate notice that the prosecution was seeking to impose this additional punishment . . . ."  (*Id.* at p. 950.)

In *Anderson*, the Supreme Court stated: "Unlike the defendant in *Toro*, Anderson derived no possible benefit from submitting the unpleaded 25-year-to-life enhancements to the jury.  There is therefore no reason to presume from defense counsel's silence that Anderson consented to this procedure.  (Cf., e.g., *People v. Ramirez* (1987) 189 Cal.App.3d 603, 623 ['Conviction for an uncharged greater offense not only raises the problem of notice but makes the inference of consent more difficult, as there is no reason why a defendant should acquiesce in substitution of a greater for a lesser offense."];  *People v. Haskin* (1992) 4 Cal.App.4th 1434, 1440, 7 Cal.Rptr.2d 1 [applying same principle in context of sentence enhancements].)"  (*Anderson*, *supra*, 9 Cal.5th at p. 959.)  The Supreme Court was persuaded by the reasoning of *People v. Arias* (2010) 182 Cal.App.4th 1009.  It quoted the following language from that case: "Unlike with lesser related offense instructions, the 'defense will generally have no tactical interest in presenting the jury with a new avenue for imposing greater punishment.  Had the prosecution sought to amend the information to include the missing allegations, the defense may well have objected.  Of course, it is the People's burden to show implied consent by the defense.  Given the absence of anything in the record showing an amendment—and because the defense had no apparent reason to consent to one—we decline to extend the *Toro* holding to this situation.' [Citation.]"  (*Ibid.*)

The Supreme Court in *Anderson* recognized that "not every amendment to a pleading—even one that increases the defendant's potential criminal liability—need be made in writing."  (*Anderson*, *supra*, 9 Cal.5th at p. 960.)  Nevertheless, the court concluded that "no informal amendment of the information [had] occurred" (*ibid.*)

22

because the prosecution had not sought to orally amend the information, the defendant had not been asked whether he consented, and the trial court had not granted a prosecution's request to amend. (*Ibid*.) The only evidence relevant to consent in *Anderson* was defense counsel's "failure to object to certain jury instructions and verdict forms that presented a set of issues to the jury that *radically increased* the potential penalties Anderson faced." (*Ibid*., italics added.)

In his supplemental briefing, defendant argues that he had no reason to informally consent to amendment of count 3 because a violation of section 602(m) is subject to a greater potential punishment than a violation of section 602.1(a). On this basis, defendant asserts that the circumstances of this case are similar to *Anderson* and *Arias*, in which courts refused to find that a defendant had impliedly consented to "an unwritten, informal amendment of the accusatory pleading." Citing Revenue & Taxation Code section 6013's definition of "business,"[9] defendant further contends that his consent to an informal amendment should not be inferred because a church is not a business and therefore he could not have been convicted of violating section 602.1(a).

Defendant has not provided any evidence of legislative intent to show that the statutory tax definition of "business" that he cites is relevant to judicial construction of section 602.1(a). In any case, section 602.1(a) refers to "[a]ny person who intentionally interferes with any lawful business *or occupation*." (Italics added.) The word "occupation" can be defined as "[a] particular action or course of action in which a person is engaged, esp. habitually; a particular job or profession; a particular pursuit or activity." (Oxford English Dict. (3d ed. 2004) <https://www.oed.com/view/Entry/130181?redirectedFrom=occupation#eid> [as of

---

[9] The Sales and Use Tax Law defines the word " '[b]usiness' " to include "any activity engaged in by any person or caused to be engaged in by him with the object of gain, benefit, or advantage, either direct or indirect." (Rev. & Tax. Code, § 6013; see Rev. & Tax. Code, § 6001.)

Dec. 7, 2020], archived at <http://perma.cc/ZNC7-RJ27.) The phrase "business establishment" can certainly have a broader meaning than the tax definition of "business" cited by defendant. (Cf. *Stevens v. Optimum Health Institute—San Diego* (S.D. Cal. 2011) 810 F.Supp.2d 1074, 1078, 1089 [Optimum Health Institute—San Diego, a non-profit, religious organization that operated a holistic health program, was a "business establishment" within the meaning of California's Unruh Act].) The fact that defendant's conduct occurred on property belonging to a church, which defendant now claims does not qualify as a business under Revenue and Tax Code section 6013, does not rule out the possibility that defense counsel consented to defendant being tried for trespass on count 3.

As to the differences in potential punishment, defendant is correct that a violation of section 602(m) was subject to greater potential punishment. A violation of section 602.1(a) was "punishable by imprisonment in a county jail for up to 90 days, or by a fine of up to four hundred dollars ($400), or by both that imprisonment and fine." (§ 602.1(a).) Section 602 does not prescribe the punishment for a violation of its subdivision (m). Section 19 states: "Except in cases where a different punishment is prescribed by any law of this state, every offense declared to be a misdemeanor is punishable by imprisonment in the county jail not exceeding six months, or by fine not exceeding one thousand dollars ($1,000), or by both."

We cannot say, however, that consent to a charge of misdemeanor trespass in violation of section 602(m) radically increased defendant's potential maximum punishment. The additional exposure was not comparable to the increase in punishment that occurred in *Anderson*, *supra*, 9 Cal.5th 946 (a total of an additional 125 years to life based on five unpleaded enhancements) or in *Arias*, *supra*, 182 Cal.App.4th 1009 (life sentences instead of determinate terms based on unpleaded allegations that attempted murders were committed willfully, deliberately, and with premeditation). Moreover, we

24

see another reason that defense counsel may have acquiesced to the trespass charge in this case.

To prove defendant committed trespass under section 602(m), the People had to prove that he had "occup[ied] real property or structures" without consent. (§ 602(m).) Defendant was homeless and had occasionally camped on church grounds. On one occasion, the pastor had given defendant permission to stay on church property while it was raining. The pastor had testified that homeless people were welcome to attend services, and defendant was present on the church's property before the Saturday morning service. As indicated by defense counsel's proposed instruction and her closing argument, the defense's consistent theory was that defendant had not "occupied" church property because he had not engaged in a non-transient, continuous type of possession. Thus, defense counsel may well have believed that she had a better chance of obtaining a not guilty verdict on a charge of misdemeanor trespass than on a charge of misdemeanor interference with a lawful business or occupation.

In this case, defense counsel had multiple opportunities to object to having the jury decide whether defendant had violated section 602(m) instead of section 602.1(a). The trial court explicitly brought the proposed instruction, CALCRIM No. 2931, to the attention of defense counsel and asked for her input. Defense counsel and the prosecutor each submitted to the court a proposed instruction on criminal trespass pursuant to CALCRIM No. 2931, although defense counsel's version added language to explain the meaning of "occupy." Defense counsel affirmatively told the jury that in count 3, defendant was charged with trespass. Counsel did not object when the trial court instructed the jury on trespass. Neither did she object in the trial court to the verdict form on count 3 or defendant's conviction of trespass under section 602(m).

Accordingly, we conclude that this case is more analogous to *Toro* than *Anderson*. Under the circumstances of this case, the reasonable inference is that defense counsel informally consented to defendant being tried for a violation of section 602(m), rather

25

than a violation of section 602.1(a), and waived any objection based on lack of notice. No instructional error has been shown.

C. *Alleged Ineffective Assistance of Counsel for Failing to Raise* Dueñas

Relying upon *Dueñas*, *supra*, 30 Cal.App.5th 1157, defendant asserts that defense counsel rendered ineffective assistance by not objecting to the imposition of a court operations assessment (§ 1465.8, subd. (a)(1)), a court facilities assessment (Gov. Code, § 70373, subd. (a)(1)), and a restitution fine (§1202.4, subds. (b), (c)) on the ground of his inability to pay.[10]

1. *Background*

Court of Appeal, Second District, Division 7 decided *Dueñas*, *supra*, 30 Cal.App.5th 1157 on January 8, 2019. Defendant was sentenced in this case approximately two and a half months later.

At the sentencing hearing on March 27, 2019, the trial court imposed a $300 fine, a $120 security fee, and a $90 facility fee, "for a total fine of $510 payable to the California Department of Corrections." The trial court also imposed and "stayed" a $300 parole revocation restitution fine under section 1202.45. Defense counsel did not raise any objection based on *Dueñas*.

_____

[10] Subsequent to *Dueñas*, the California Supreme Court granted review in *People v. Kopp* (2019) 38 Cal.App.5th 47 (*Kopp*), review granted on Nov. 13, 2019, S257844. The Supreme Court limited its review to the following issues: "(1) Must a court consider a defendant's ability to pay before imposing or executing fines, fees, and assessments? (2) If so, which party bears the burden of proof regarding the defendant's inability to pay?" (<https://appellatecases.courtinfo.ca.gov/search/case/mainCaseScreen.cfm?dist=0&doc_id=2296622&doc_no=S257844&request_token=NiIwLSEmXkw4W1AtSCJdSEJJQEQ0UDxTJiMuJz5SMCAgCg%3D%3D> [as of Dec. 7, 2020], archived at <http://perma.cc/3ESU-ZMJM.) The Supreme Court has also granted review in a number of cases in which it deferred further action pending disposition of the lead case of *Kopp*. (See, e.g., *People v. Cowan* (2020) 47 Cal.App.5th 32, review granted June 17, 2020, S261952; *People v. Belloso* (2019) 42 Cal.App.5th 647, review granted March 11, 2020, S259755; *People v. Hicks* (2019) 40 Cal.App.5th 320, 325-329, review granted Nov. 26, 2019, S258946.)

The abstract of judgment reflected that defendant was obligated to pay a $300.00 fine pursuant to section 1202.4, subdivision (b), and a $ 300.00 fine pursuant to section 1202.45, which fine was suspended unless parole is revoked.  The abstract also reflected that defendant was obligated to pay a court operations assessment—previously called a court security fee—of $120 pursuant to section 1465.8 and a conviction assessment—sometimes called a court facilities assessment—of $90 pursuant to Government Code section 70373.

2. *Governing Law*

To prevail on a claim of ineffective assistance of counsel, a criminal defendant must establish that defense counsel's performance was deficient and that counsel's deficient performance resulted in prejudice.  (*Strickland v. Washington* (1984) 466 U.S. 668, 687 (*Strickland*).)  As to the first prong of an ineffective assistance claim, a "defendant must show that counsel's representation fell below an objective standard of reasonableness" (*id*. at p. 688), as measured "under prevailing professional norms." (*Ibid*.)  As to the second prong, a "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Id*. at p. 694.)  "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Ibid*.; see *Harrington v. Richter* (2011) 562 U.S. 86, 111-112.)  "Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim." (*Strickland*, *supra*, at p. 700.)

Section 1465.8, subdivision (a)(1), provides in pertinent part: "To assist in funding court operations, an assessment of forty dollars ($40) shall be imposed on every conviction for a criminal offense . . . ."  Government Code section 70373, subdivision (a)(1), states in pertinent part: "To ensure and maintain adequate funding for court facilities, an assessment shall be imposed on every conviction for a criminal offense . . . . The assessment shall be imposed in the amount of thirty dollars ($30) for each

misdemeanor or felony . . . ."  Neither section allows the trial court to consider a defendant's ability to pay in imposing those assessments.

Under the statutory directive of section 1202.4, a trial court must impose a restitution fine in every case where a person is convicted of a crime.  (§ 1202.4, subds. (b), (c).)  If the person is convicted of felony, the minimum restitution fine is $300. (§ 1202.4, subd. (b)(1).)  The statute prohibits consideration of ability to pay when imposing the minimum restitution fine: "A defendant's inability to pay shall not be considered a compelling and extraordinary reason not to impose a restitution fine. Inability to pay may be considered only in increasing the amount of the restitution fine in excess of the minimum fine pursuant to paragraph (1) of subdivision (b) [of section 1202.4]."  (§ 1202.4, subd. (c).)

In *Dueñas*, the appellate court held that "due process of law requires the trial court to conduct an ability to pay hearing and ascertain a defendant's present ability to pay before it imposes court facilities and court operations assessments under . . . section 1465.8 and Government Code section 70373."  (*Dueñas*, *supra*, 30 Cal.App.5th at 1164.) The appellate court also held that "although . . . section 1202.4 bars consideration of a defendant's ability to pay unless the judge is considering increasing the fee over the statutory minimum, the execution of any restitution fine imposed under this statute must be stayed unless and until the trial court holds an ability to pay hearing and concludes that the defendant has the present ability to pay the restitution fine."  (*Ibid*.)

3.  *Ineffective Assistance Not Established*

A number of appellate courts or decisions have disagreed with *Dueñas*.  (See, e.g., *People v. Petri* (2020) 45 Cal.App.5th 82, 90-92 [finding *Dueñas* unpersuasive], review den. Apr. 15, 2020, S261019; *People v. Cota* (2020) 45 Cal.App.5th 786, 795 [agreeing that " '[n]either strand [of due process precedent] bars the imposition of [the] assessments and the . . . restitution fine' even as to a defendant who is unable to pay"], review den. May 13, 2020, S261543; *People v. Adams* (2020) 44 Cal.App.5th 828, 829, 831-832

28

[*Dueñas* was wrongly decided], review den. April 15, 2020, S261092; *People v. Kingston* (2019) 41 Cal.App.5th 272, 279 [agreeing that due process does not preclude a court from imposing fines and assessments on a defendant who lacks ability to pay unless "to do so would deny the defendant access to the courts or result in the defendant's incarceration"]; *People v. Caceres* (2019) 39 Cal.App.5th 917, 926-927 ["the due process analysis in *Dueñas* does not justify extending its holding beyond those [unique] facts"], review den. Jan. 2, 2020, S258720; *People v. Aviles* (2019) 39 Cal.App.5th 1055, 1060 [*Dueñas* was wrongly decided; "a constitutional challenge to the imposition of fines, fees, and assessments should be based on the Excessive Fines Clause of the Eighth Amendment instead of the due process rationale utilized in *Dueñas*"], 1061, 1067-1069, review den. Dec. 11, 2019, S258563; see also *People v. Santos* (2019) 38 Cal.App.5th 923, 935-940 (dis. opn. of Elia, J.).)[11]  For all the reasons presented in those decisions, we remain convinced that *Dueñas* was wrongly decided.  Unless and until the Supreme Court resolves the issue to the contrary, we cannot conclude that defense counsel's rendered ineffective assistance by failing to object to the challenged assessments and restitution fine based on *Dueñas*.

## DISPOSITION

The judgment is affirmed.

---

[11] In 2020, the Supreme Court has been denying review without prejudice to any relief to which the petitioner might be entitled after it decides *People v. Kopp*, review granted November 13, 2019, S257844.  (See *ante*, fn. 10.)

29

_____

ELIA, ACTING P.J.

I CONCUR:


_____

BAMATTRE-MANOUKIAN, J.




*People. v. Waite*
H046785

GREENWOOD, P.J., Concurring and Dissenting.

I concur with my colleagues' resolution of Waite's claims except for their rejection of *People v. Dueñas* (2019) 30 Cal.App.5th 1157.  I respectfully dissent from their conclusion that *Dueñas* was wrongly decided and that Waite's trial counsel's failure to raise *Dueñas* at sentencing could not amount to constitutionally ineffective assistance of counsel under *Strickland v. Washington* (1984) 466 U.S. 668.  Accordingly, I would reverse and remand the matter to the trial court for the limited purpose of conducting a hearing on Waite's ability to pay the court operations assessment (Pen. Code, § 1465.8, subd. (a)(1)), the court facilities assessment (Gov. Code, § 70373) and the restitution fine (Pen. Code, § 1202.4, subds. (b) & (c)).  (*People v. Santos* (2019) 38 Cal.App.5th 923, 933-934.)

_____                          _____
                                                      Greenwood, P.J.

People v. Waite
H046785